[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 99 
 On Application for Rehearing
This court's opinion of January 30, 1998, is withdrawn, and the following is substituted therefor.
Sheralyn Williams and her mother, Thelma Walker Brown, sued Norwest Financial Alabama, Inc., American Security Insurance Company, and Centurion Life Insurance Company on August 23, 1994, alleging fraudulent misrepresentation, fraudulent suppression, conspiracy to defraud, and negligence and wantonness.[1]
American Security moved for a summary judgment on December 9, 1996; Norwest and Centurion moved for a summary judgment on December 30, 1996. Following an ore tenus proceeding, the trial court, on May 13, 1997, entered a summary judgment in favor of the defendants. Williams and Brown appealed. This case was transferred to this court by the supreme court, pursuant to §12-2-7 (6), Ala. Code 1975.
This action arose out of several loan transactions between the plaintiffs and Norwest. The evidence indicates that Brown had borrowed money from Norwest on approximately 12 occasions from September 1975 to April 1992 and had purchased credit life insurance on some of those loans. In April 1992, Brown and Williams discussed how they would pay for another semester of college tuition for Williams's daughter. Brown decided to borrow the money from Norwest, with the understanding that Williams would repay the loan.
Brown contacted the Norwest office in Montgomery and applied for the loan. Norwest informed her that the loan would have to be secured. Brown suggested that she use her residence to secure the loan, as she had done in the past. Dave Kelley and Thomas Brooks, employees of Norwest, visited Brown's residence in Tuskegee to appraise it for the loan. While there, they offered to let Brown sign the loan papers to save her a trip to Montgomery. Brown testified that she signed the loan papers without first reading them; however, she stated that she had understood that one of the papers was a second mortgage on her residence. Brown stated that she considered the Norwest representatives' offer to let her sign the loan papers at that time a favor because her husband was in poor health. She further stated that she had not read the papers because she had dealt with Norwest in the past and was comfortable with Kelley.
Brown was later notified by Norwest that she would need a cosigner to obtain the loan. Brown contacted Williams, who agreed to cosign for the loan. Norwest contacted Williams and requested that she go to the Norwest office in Jacksonville, Florida, where she lived, to complete the necessary loan papers. Williams met with Jay Erickson *Page 100 
in the Jacksonville Norwest office. Erickson instructed Williams to sign the papers where he had marked them with an "X". Williams stated that she had not read any of the documents before she signed them and that they were not explained to her by Erickson. Williams further stated that she did not know when she signed the loan documents that a portion of the proceeds was being used to satisfy a 1990 loan from Norwest to Brown. She stated, however, that even if she had known this she still would have agreed to co-sign the loan. Williams signed a document indicating that she wanted to purchase credit life insurance and involuntary unemployment insurance. She also signed the mortgage executed by Brown, in favor of Norwest, for $5,997.43.
Brown testified that someone from Norwest had informed her that Williams had qualified for the loan and that they no longer needed her on the loan. Thereafter, Brown received the loan proceeds and deposited them into her bank account on April 24, 1992. Approximately two weeks later, Brown received a packet of completed loan documents from Norwest, including a copy of the note and the recorded mortgage on her residence. Brown testified that she did not "scrutinize" these documents.
In 1993, following the death of her husband, Brown sought another mortgage loan on her residence "to get her financial affairs in order." A title search revealed the April 1992 mortgage in favor of Norwest. Brown testified that she was unaware of the mortgage before that time because, she said, she had "assumed" that when Williams qualified for the loan in April 1992 the mortgage on Brown's residence was no longer necessary.
At the outset, we note that in reviewing the disposition of a motion for summary judgment, we use the same standard the trial court used in determining whether the evidence before it presented a genuine issue of material fact and whether the movant was entitled to a judgment as a matter of law. Bussey v. JohnDeere Co., .531 So.2d 860, 862 (Ala. 1988); Rule 56 (c), Ala. R. Civ. P. When the movant makes a prima facie showing that no genuine issue of material fact exists, the burden shifts to the nonmovant to present substantial evidence creating such an issue.Bass v. SouthTrust Bank of Baldunn County, 538 So.2d 794 (Ala. 1989). Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989). This court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie,Inc., 564 So.2d 412 (Ala. 1990).
 The Credit Life Insurance Claims
Williams contends that Norwest and American Security misrepresented to her that she was required to purchase involuntary unemployment insurance in conjunction with her co-signing on the April 1992 loan.[2] She specifically alleges fraudulent misrepresentation because she was instructed to sign by the "X" without any explanation that she was not required to purchase involuntary unemployment insurance to obtain the loan. One of the documents that Williams signed contained the following statement: "Credit Insurance is not required. Credit life insurance, credit accident and health insurance, and credit involuntary unemployment insurance are not required to obtain credit and will not be provided unless you request them by signing next to the coverage you want." Williams's signature appears next to the following statement, which is located adjacent to the above-quoted passage: "I want . . . 3. Life and Involuntary Unemployment."
Alabama adheres to the traditional rule of "lex loci delicti," which provides that an Alabama court will determine the substantive rights of an injured party according to the law of the state where the injury *Page 101 
occurred. Fitts v. Minnesota Mining Manufacturing Co.,581 So.2d 819 (Ala. 1991). American Security argues that Florida substantive law should be applied to Williams's claims, since she signed the loan documents in Florida and the facts and circumstances giving rise to her claims occurred in Florida. Williams argues that where documents executed by the parties contain a choice-of-law clause an exception to the rule of "lex loci delicti" exists. The documents signed by the parties contained the following choice-of-law clause: "This loan and Note and Security Agreement are governed by the laws of Alabama." Thus, Williams contends, Alabama substantive law should be applied to her claims.
The trial court determined that Florida substantive law was the proper law to be applied to Williams's claims and that a summary judgment in favor of the defendants was proper under Florida law. However, the court noted that "out of an abundance of caution the court will address the issues as to Ms. Williams in light of the law of Alabama as well." We conclude that the choice-of-law clause would require that Alabama law be applied if Williams had complained of a breach of the loan and security agreement; however, Williams's claims sound in tort and allegedly arise from the I acts and circumstances surrounding the making of the loan and security agreement. Therefore, the choice-of-law clause does not supersede the rule of "lex loci delicti." However, because the trial court applied Alabama law in reviewing Williams's claims we will apply Alabama law in reviewing her claims.
Brown also contends that Norwest fraudulently misrepresented to her that the purchase of credit insurance was required to obtain certain loans. Like Williams, Brown argues that the Norwest representative's instructions to her about where to sign the documents, given without an explanation that the purchase of insurance was not required, constituted a fraudulent misrepresentation. Brown testified that the representative "just showed me where to sign" and that that is what she did. She stated that no one explained the credit insurance to her. Like Williams, Brown did not read the documents before she signed them.
Brown had obtained a number of loans from Norwest from January 1976 through April 1992. She had purchased credit insurance with some, but not all, of the loans. Brown did not purchase credit insurance with the April 1992 loan — she had last purchased credit insurance with the January 1990 loan. At that time, Brown had signed a document that contained a statement similar to the statement contained in the document that Williams had signed. It stated: "CREDIT LIFE AND CREDIT ACCIDENT AND HEALTH INSURANCE. Credit life insurance and credit accident and health insurance are not required to obtain credit, and will not be provided unless you sign and agree to pay the additional cost." Brown's signature is located below the following statement, which is contained in a box: "I want credit life and credit accident and health insurance." This box is located directly adjacent to the term and premium statements regarding the credit insurance.[3]
Christopher Schroeder, a district manager for Norwest, stated in an affidavit that he had reviewed all available insurance statements used by Norwest since 1975 and that each of them contained a statement similar to this one.
In order for Williams and Brown to prevail on their fraudulent misrepresentation claims, they must prove the following: (1) a false statement, (2) concerning a material existing fact, (3) reliance upon the false statement, (4) and damage as a proximate result of relying upon the false statement. Pitts v. Boody,688 So.2d 832 (Ala.Civ.App. 1996); Reeves Cedarhurst DevelopmentCorp. v. First American Federal Savings Loan Ass'n,607 So.2d 180 (Ala. 1992). We conclude *Page 102 
that the claims of fraudulent misrepresentation fail because Williams and Brown failed to establish that a false statement or misrepresentation was ever made.
Williams testified that when she signed the loan documents there was no discussion regarding credit insurance between her and a Norwest representative, that no one had told her that she had to purchase the credit insurance to receive the loan, and that had there been a discussion or a representation made regarding the credit insurance she would have questioned it.
Brown testified that no Norwest employee had ever told her that the purchase of credit insurance was required to obtain the loan. She stated that she never inquired whether the purchase of insurance was required, but, rather, just assumed that it was.
Williams and Brown's contentions that a false representation occurred when the Norwest representatives instructed them to sign by the "X," without explaining that credit insurance was not required, are without merit. Assuming that the actions did constitute a false statement or representation, Williams and Brown could not have justifiably relied upon it. Reliance upon a particular statement should be assessed by the following standard:
 "`"A plaintiff, given the particular facts of his knowledge, understanding, and present ability to fully comprehend the nature of the subject transaction and its ramifications, has not justifiably relied on the defendant's representation if that representation is "one so patently and obviously false that he must have closed his eyes to avoid the discovery of the truth."'"
Hickox v. Stover, 551 So.2d 259, 263 (Ala. 1989), quotingSouthern States Ford, Inc. v. Proctor, 641 So.2d 1081, 1091-92
(Ala. 1989) (Hornsby, C.J., concurring specially).[4]
Williams had studied accounting at Howard University for three years. At the time of the hearing, she was employed with CSX Railroad as manager of employee relations. The record indicates that Williams is a bright and intelligent woman.
Brown had received a bachelor's degree in nursing from Tuskegee University. She later obtained a master's degree in public health from the University of Michigan and a doctorate in administration and higher education from Highland University. She has held a number of supervisory and administrative positions over the years, including nursing supervisor, nursing administrator, and chief nurse coordinator. She has served as a consultant for the State of Alabama on maternal and child health issues. Brown has also served as an assistant dean of nursing at Tuskegee University, as well as an adjunct faculty member. At the time of the hearing, Brown was serving as the administrator of the Grace Community Mental Health Center.
The language in the loan documents indicating that the purchase of credit insurance was not required in order to obtain the loans did not appear in fine print, and it was clear and unambiguous. If Williams and Brown had read the documents, they would have understood that credit insurance was not required for them to obtain the loan. Even assuming that the Norwest representatives' instructions to sign by the "X" constituted a false statement or representation, it was one so patently and obviously false that Williams and Brown would have had to close their eyes to avoid the discovery of the truth. Id.
Williams and Brown next contend that the defendants fraudulently suppressed the fact that the purchase of credit insurance was not required to obtain the loan. To recover on a claim of fraudulent suppression, the plaintiff must prove: (1) the suppression of a material fact (2) that the defendant was under a duty to communicate (3) because of a confidential relationship between the parties or the circumstances of the case and (4) which caused injury as a proximate consequence. Garner v.JMIC Life Ins. Co., 693 So.2d 478 (Ala.Civ.App. 1997). The document Williams signed clearly indicated that the purchase of credit insurance was not required to obtain the loan. The document *Page 103 
Brown signed in January 1990 clearly indicated that the purchase of credit insurance was not required to obtain the loan.
In Robinson v. JMIC Life Ins. Co., 697 So.2d 461 (Ala. 1997), a factually similar case, our supreme court affirmed a summary judgment on a fraudulent suppression claim where the document itself put the plaintiff on notice that she was purchasing credit insurance. The court stated:
 "On one document, for example, Robinson signed directly by a box containing the following disclosures: `Credit Life $235.24.' Another form signed by Robinson and related to her purchase of credit life insurance is entitled `Schedule of Insurance'; it refers to `insurance' or `life insurance' no fewer than 14 times. Certainly, given Robinson's ability to read and understand these key terms, and her decision not to examine the documents in issue before she signed them, we conclude that she cannot now complain that she was ignorant of the fact that she was purchasing credit life insurance."
Id., at 462. See also Henson v. Celtic Life Ins. Co.,621 So.2d 1268, 1273-74 (Ala. 1993). We conclude that there was no suppression of a material fact, because the documents Williams and Brown signed were sufficient to put them on notice that the purchase of insurance was not required.
 The Mortgage Claims
Brown contends that Norwest fraudulently suppressed the existence of the mortgage executed and placed on her home. She specifically argues that Norwest is liable for suppression because she was informed by Norwest that Williams had qualified for the loan and that she was no longer needed on the loan, yet Norwest still executed the mortgage on her residence. This argument is without merit.
An essential element in a fraudulent suppression claim is the suppression of a material fact. Garner, supra. The evidence indicates that when Brown was informed that the April 1992 loan would have to be secured, she suggested that she use her residence to secure the loan, as she had done in the past. Thereafter, the Norwest representatives visited the residence in order to appraise it. Brown testified that she "figured" the purpose of the visit was to appraise the residence for the second mortgage. Although she did not read the documents that she signed while the representatives were at her residence, Brown admitted that she understood one of the documents to be a second mortgage on her residence. Finally, within two weeks of receiving the loan proceeds, Brown received from Norwest a copy of the note and recorded mortgage, which clearly indicated that a mortgage on her residence had been executed in favor of Norwest and had been recorded. Brown testified that she did not scrutinize these documents. We conclude that Brown failed to establish that Norwest suppressed the existence of the mortgage on her residence. Not only had Brown herself suggested that the loan be secured with a mortgage, but she, in fact, understood that she had signed a mortgage and she received a copy of the note and recorded mortgage from Norwest shortly after receiving the loan proceeds. These documents disclosed the fact allegedly suppressed and were sufficient to put her on notice of the existence of the mortgage. Robinson, supra. See also, Henson, supra.
Brown next contends that Norwest misrepresented to her that it was not placing a mortgage on her home when it, in fact, did. Brown testified that after Williams had qualified for the loan, she was contacted by Norwest and told that she was no longer needed on the loan. She contends that that representation constituted a misrepresentation. An essential element of a fraudulent misrepresentation claim is that a false statement or misrepresentation has been made concerning an existing material fact. Pitts, supra. We conclude that Brown failed to establish that a false statement or misrepresentation was ever made to her regarding the mortgage. She testified that no representation was ever made to her that Norwest was not going to place the mortgage on her residence; rather, she stated that after she was told that Williams had qualified for the loan she simply assumed that the mortgage was no longer necessary. See McCausland v.Tide-Mayflower Moving Storage, *Page 104 499 So.2d 1378 (Ala. 1986) (summary judgment in favor of defendant affirmed where plaintiff failed to establish that a representation was made to him).
Brown next contends that Norwest fraudulently suppressed the fact that financing alternatives existed that were less expensive than refinancing. Brown contends that Norwest practices "flipping," a practice whereby customers are encouraged to refinance existing loans rather than make new and separate loans. Brown argues that the loans offered by Norwest are primarily closed-end transactions in which the interest and finance charges are determined at the time the loan originates. She states that these charges are applied early in the term of the loan and that as the term of the loan progresses the charges decrease. She contends that Norwest induces its customers to refinance the existing loans early in their terms so that the customers are continually paying the interest and finance charges at a higher rate.
Brown refinanced the January 1990 loan with the April 1992 loan. She contends that the effect of taking the second loan without having paid the balance on the prior loan should have been disclosed to her, along with the fact that other financing alternatives existed. Suppression of a material fact that one has a duty to communicate constitutes fraud. Garner, supra. The duty to speak or to disclose certain facts may arise from a confidential relationship between the parties, the particular facts or circumstances of each case, or a request for information. Id.; McGowan v. Chrysler Corp., 631 So.2d 842 (Ala. 1993). Brown testified that she never discussed with Norwest the effects of refinancing the January 1990 loan with the April 1992 loan and did not inquire as to any financing alternatives. Additionally, no evidence exists that would give rise to a confidential relationship between the parties. Brown had previously dealt with Norwest on a number of occasions; however, prior business contact alone does not give rise to a confidential relationship. Amerson v. Gardner, 681 So.2d 570 (Ala.Civ.App. 1996). Nothing in the record indicates that the transaction complained of was anything other than an arm's-length transaction between the parties. Accordingly, we conclude that the summary judgment was properly entered in favor of Norwest on this count. Our holding should not be construed as meaning that a fraudulent-suppression cause of action cannot arise out of the practice of "flipping." While nothing prohibits the refinancing or consolidation of an existing loan with a subsequent loan, the practice has the potential for less scrupulous lenders to prey on a certain segment of our society and under certain circumstances could rise to the level of fraud. Our holding is expressly limited to the facts of this case.
 Negligence and Wantonness Claim
Williams and Brown allege various theories of recovery sounding in negligence and wantonness. We conclude that their negligence and wantonness claims are time-barred by the applicable statute of limitations. Negligence and wantonness claims have a statutory period of limitations of two years from the date that the injury occurred. Henson, supra. Further, Alabama has no "discovery rule" with respect to negligence or wantonness actions that would toll the running of the limitations period. Id. If, in fact, Williams and Brown were injured by any negligent or wanton conduct of the defendants, the latest that the injury could possibly have occurred was April 1992. The complaint was not filed until August 23, 1994, after the statutory limitations period had expired.
 The Conspiracy Claim
Williams and Brown contend that the defendants conspired to defraud them. We note that the viability of a civil conspiracy claim depends upon the viability of the claim relating to the underlying civil wrong made the subject of the conspiracy. In other words, conspiracy itself furnishes no civil cause of action. Triple J Cattle, Inc. v. Chambers, 621 So.2d 1221 (Ala. 1993). Thus, the conspiracy claim must fail if the underlying act would not support the claim. Id. Therefore, because we conclude that the summary judgment was proper on the fraudulent misrepresentation and suppression *Page 105 
claims, we necessarily conclude that the summary judgment was also proper on the conspiracy claim.
OPINION OF JANUARY 30, 1998, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION FOR REHEARING OVERRULED AND 39 (k) MOTION DENIED; AFFIRMED.
ROBERTSON, P.J., and MONROE and CRAWLEY, JJ., concur.
THOMPSON, J., concurs in the result.
[1] Norwest is a finance company. Centurion is a subsidiary of Norwest that underwrites credit life insurance on Norwest loans. American Security underwrites involuntary unemployment insurance on Norwest loans.
[2] As noted earlier in this opinion American Security underwrites involuntary unemployment insurance on loans made by Norwest. American Security sells credit insurance products to various financial institutions. American Security does not employ agents to sell credit insurance products directly to consumers; rather the agents who sell the insurance products to the consumers are employees of the financial institutions.
[3] We note that during the time period in which Brown was obtaining loans from Norwest she also obtained approximately 38 loans from Alabama Exchange Bank. She purchased credit insurance on approximately 19 of the loans. Each document contained a clause stating that the purchase of credit insurance was not required in order to obtain the loan. To purchase the credit insurance, she was required to sign her name next to a statement indicating that she wished to purchase the credit insurance.
[4] In Foremost Ins. Co. v. Parham, 693 So.2d 409 (Ala. 1997), our supreme court overruled the "justifiable reliance" standard enunciated in Hickox. However, because the complaint in this present case was filed before March 14, 1997, the justifiable reliance standard is applicable to this case.