Felicitea v. PESCIA, Plaintiff,

v.

**AUBURN FORD–LINCOLN MERCURY INC., et al., Defendants.**

No. Civ.A. 96–C–1811–E.

United States District Court, M.D. Alabama, Eastern Division.

July 29, 1999.

John A. Tinney, Roanoke, AL, for Felicitea V. Pescia, plaintiff.

Jeffrey E. Friedman, Christopher J. Zulanas, Friedman, Leak & Bloom, PC, Birmingham, AL, for Auburn Ford–Lincoln–Mercury, Inc., defendant.

William L. Howell, William L. Howell, P.A., Mobile, AL, Brenda Drendel Hetrick, Honeycutt, Hetrick & Carter, LLP, Mobile, AL, for Ford Motor Credit Company, defendant.

## MEMORANDUM OPINION AND ORDER

CARROLL, United States Magistrate Judge.

## I. INTRODUCTION AND PROCEDURAL HISTORY

On November 13, 1996, the plaintiff, Felicitea Pescia, filed this action in the Circuit Court of Lee County, Alabama, against Auburn Ford Lincoln Mercury (hereinafter "Auburn Ford") and Ford Motor Credit Company (hereinafter "FMCC"). The case was then removed to this court. Following a period of discovery, on February 27, 1998, the plaintiff filed an amended complaint which retained Auburn Ford and FMCC as defendants and added a third defendant, A.J. Ferguson. The amended complaint raises the following 12 claims.[1]

(1) Statutory Fraud (Auburn Ford and FMCC);

(2) Suppression of Material Facts (Auburn Ford and FMCC);

(3) Outrageous Conduct (Auburn Ford and FMCC);

(4) Fraud (FMCC);

(5) Negligence (Auburn Ford);

(6) Suppression (FMCC);

(7) Negligence (FMCC);

(8) Negligent Supervision (FMCC);

(9) Negligence (Auburn Ford);

(10) Civil Conspiracy (Auburn Ford, FMCC and A.J. Ferguson);

(11) Civil Conspiracy (Auburn Ford and FMCC);

(12) Negligent Supervision (A.J.Ferguson).

This cause currently is pending before the court on motions for summary judgment filed by each defendant. For the reasons which follow the court concludes that the motions filed by Auburn Ford and FMCC are due to be granted in part and denied in part; and that the motion filed by A.J. Ferguson is due to be granted.

## II. FACTS[2]

The plaintiff, Felicitea Pescia, went to Auburn Ford on August 14, 1996 to purchase a used Ford Taurus. Ms. Pescia wanted to purchase a low mileage used car so that there would be some time left on the factory warranty. When she entered the Auburn Ford lot, Ms. Pescia was approached by a salesman named Kyle and Ms. Pescia told him what she wanted. Kyle found a car that fit the description of what she was looking for. After a test drive, Ms. Pescia decided she wanted to

---

1. The defendant named in each count is listed in parentheses.

2. The facts as stated in this section are, as the law requires, viewed in a light most favorable to the plaintiff.

purchase the automobile she had driven. She told Kyle that she had $1700 to pay down. Kyle then told her to meet with Vandy Wilson, the Auburn Ford business manager, to discuss the financial details of the purchase. Wilson asked Pescia how much she had to put down on the automobile and, according to Pescia, she told him what she had told Kyle—she had $1700 to put down. Wilson asked her to step outside while he looked for a company that would finance the transaction. Wilson then called Pescia back to his office and told her that he had several financing options at a 23% to 26% interest rate, resulting in payments of over $600.00. Pescia told Wilson that she absolutely could not afford such payments. Wilson then told her he would talk to FMCC, Ford's credit company. Again, he asked Ms. Pescia to step outside. Wilson then called Ms. Pescia back into his office and told her that FMCC agreed to finance her purchase at an interest rate of 18.25% and that the payments would be $411.58 per month. Ms. Pescia recalls that she commented that the rate was a little high and Wilson told her that the rate was the lowest he could get because of her past history of a bankruptcy. Wilson then returned to his computer and generated some forms which Ms. Pescia signed. She provided the down payment in cash. When she gave Wilson the cash, Pescia asked for a receipt. According to Pescia, Wilson told her that the sales contract was sufficient.

Before leaving Auburn Ford on August 14th, Pescia and Wilson signed an "Alabama Retail Installment Contract" which showed that Pescia had made a cash down payment in the amount of $1719.93. The form also showed that Pescia was financing $16,000 at a rate of 18.25% interest for sixty months in installments of $411.58. Pescia and Wilson also signed an application for title showing FMCC as the lienholder and an agreement to provide insurance to FMCC. In addition, Pescia and Wilson signed an Auburn Ford Buyer's

Order which showed a "cash deposit submitted with order" of $1719.83 and an unpaid cash balance due on delivery of $16,000.00. There is absolutely no language anywhere in the contract that Wilson and Pescia signed that would indicate that the contract was somehow conditional on receiving financing. Indeed, in the words of the contract, "By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract." After signing the necessary papers, Wilson gave Pescia a copy of the sales contract and some insurance papers. He shook Pescia's hand and told her that she now owned the car. Pescia then drove her Ford Taurus home.

Auburn Ford assigned a retail installment contract on the Ford Taurus which Ms. Pescia purchased to FMCC. The contract which was assigned, however, was not the contract Ms. Pescia signed on August 14, 1996. The contract assigned to FMCC by Auburn Ford showed a down payment of $1019.83 which was $700 less than the down payment on the contract which Pescia signed on August 14. The contract also showed an amount financed of $16,700 which was $700 more than the amount financed on the contract signed by Pescia on August 14. The assigned contract called for an interest rate of 16.25% which was 2% less than the interest rate Pescia agreed to on August 14. Consequently, Pescia's monthly payments under the assigned contract were $411.09 which is $0.49 less per month than the monthly payment she had agreed to on August 14. FMCC agreed to purchase the contract from Auburn Ford on August 19, 1996.

In attempting to find financing for Ms. Pescia, the dealership sent several proposals to FMCC.[3] On August 14, 1996, FMCC conditionally approved a proposal which called for a sales price of $16,719.00 with no money down and payments of $440.00 per month for 60 months. On August 19,

---

**3.** The proposals are set out in FMCC's brief in support of its motion for summary judgment at p. 7.

1996, Auburn Ford submitted a contract to FMCC for assignment which contained terms different from the contract terms which FMCC had agreed to purchase. FMCC agreed to accept the assignment and paid Auburn Ford for the contract.

On August 27, 1996, Mike Bradshaw, an employee of FMCC, called Pescia to verify the terms of her contract. Bradshaw went over the contract line by line comparing the contract which he had to the copy of the contract which the plaintiff had. During the conversation, as reflected on Bradshaw's verification form, Pescia told him that she made a down payment of $1719.83 and the amount financed on her contract was $16,000 not $16,700.[4] In an affidavit which she has filed, Ms. Pescia represents that Bradshaw told her he would look into her situation and get back with her. Pescia has testified that she sent all of her papers to Bradshaw, at his request and to an address he furnished her.

Eventually, the discrepancy that Pescia pointed out came to the attention of Marie Reeves, Bradshaw's supervisor. On September 18, 1996, Reeves faxed a copy of the retail commodity verification form completed by Bradshaw to Jerry Floyd, an FMCC employee who was supervising the operation of Auburn Ford. Floyd was at Auburn Ford protecting FMCC assets because of problems with the dealership. Sometime after September 18, 1996, while Floyd was still at Auburn Ford, he talked with Vandy Wilson about the variations between the contract in Pescia's possession and the contract assigned by Auburn Ford to FMCC. Floyd asked Wilson about the variation in the amount of the down payment and Wilson showed him a receipt for $1,020 from Ms. Pescia. Floyd also asked about the interest rate and was told by Wilson that there was second contract because he had decided to give her a lower interest rate on the second contract than he had given her on the first contract. Wilson also said that he did not have a copy of the first contract but that Pescia had signed both contracts including the

contract which FMCC had. Floyd faxed Reeves the documents which he received from Wilson and reported his findings. Reeves spoke with Damon Ferguson and Pervis Hester of Auburn Ford and reminded the dealership of its responsibility to repurchase the contract if the contract proved to be unenforceable.

## III. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." This standard can be met by the movant, in a case in which the ultimate burden of persuasion at trial rests on the nonmovant, either by submitting affirmative evidence negating an essential element of the nonmovant's claim, or by demonstrating that the nonmovant's evidence itself is insufficient to establish an essential element her claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The burden then shifts to the nonmovant to make a showing sufficient to establish the existence of an essential element to his claims, and on which he bears the burden of proof at trial. *Id.* To satisfy this burden, the nonmovant cannot rest on the pleadings, but must, by affidavit or other means, set forth specific facts showing that there is a genuine issue for trial. Fed. R.Civ.P. 56(e).

The court's function in deciding a motion for summary judgment is to determine whether there exist genuine, material issues of fact to be tried; and if not, whether the movant is entitled to judgment as a matter of law. *See Dominick v. Dixie Nat'l Life Ins. Co.,* 809 F.2d 1559 (11th Cir.1987). It is substantive law that identifies those facts which are material on motions for summary judgment.

---

4. Bradshaw completed an FMCC form entitled "Retail Commodity Verification."

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also De Long Equip. Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499 (11th Cir.1989).

When the court considers a motion for summary judgment, it must refrain from deciding any material factual issues. All the evidence and the inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The movant bears "the exacting burden of demonstrating that there is no dispute as to any material fact in the case." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

## B. AUBURN FORD LINCOLN MERCURY

### 1. FALSE REPRESENTATION (Count I)

In Count I of her amended complaint, Ms. Pescia claims that Auburn Ford is guilty of fraudulent misrepresentation because Vandy Wilson represented to her that he had obtained the lowest interest rate available when he told her that FMCC would finance her car at 18.25%. The elements of the tort of fraudulent misrepresentation are well-settled. They are (1) a false representation; (2) of a material fact; (3) that is justifiably relied upon, and (4) damage resulting as a proximate cause. *Armstrong v. Flowers Hospital, Inc.,* 812 F.Supp. 1183 (M.D.Ala.1993), *aff'd,* 33 F.3d 1308 (11th Cir.1994); *Spring Hill Lighting & Supply Co. v. Square D Co.,* 662 So.2d 1141 (Ala.1995).

Pescia's testimony as to the fraudulent misrepresentation is as follows:

A. Mr. Wilson asked me how much money I had to put down on the automobile. I told him I had seventeen hundred dollars to put down. He told me that that would help in financing and that he would have to pull a credit application and look for some finance company—you know, see who he could finance me with. I told him that was fine. At that time, he directed me—said I could take a break, go outside while he took care of this. I went outside for a little while. He called me back in there, and he told me he had—

Q. Wilson?

A. Mr. Wilson—I'm sorry—told me that he had several financing options and the interest rates were like twenty-six percent, twenty-three percent, and the payments were six hundred and something dollars. And I said, Mr. Wilson, I cannot—absolutely cannot afford a payment like this.

Q. Did Mr. Wilson tell you what credit sources he was referring to?

A. He may have. And I don't—I don't remember off the top of my head. I was just astounded at the options and the payment and made it clear that there was just no way.

Q. Do you recall one way or another whether or not he mentioned who the potential credit source was that had those high rates?

A. No, sir.

Q. You don't recall one way or the other?

A. No, sir.

Q. Go ahead.

A. Mr. Wilson then said, well, let me try our finance company. And I said, who's that? And he said, Ford Motor Credit. And I said, oh, okay. He said, if you'll just step out again, take you a little break, walk around—Mr. Wilson said that—I'll get back with you.

I went outside again, smoked a cigarette. In about ten, fifteen minutes, Mr. Wilson called me back in his of-

fice. He said, we've had good luck; Ford Motor Credit will finance you. And I said, well, what's the payment and what's the interest rate? And he said the interest is 18.25. And I said, ooh, isn't that a little high? And he said, well, Ms. Pescia, this is the lowest that we could get you because of your past history with your bankruptcy; that kind of put you in a bad category.

So I said how much would the payments be? He told me four eleven fifty-eight. I said, well, I wanted them around four hundred; I guess I could do a little bit more. And I agreed to that.

Under the decision of the Alabama Supreme Court in *Ex Parte Ford Motor Credit Co.,* 717 So.2d 781 (Ala.1997), the evidence presented by the plaintiff is insufficient to avoid summary judgment. The court, in *Ex Parte Ford Motor Credit,* makes clear that an automobile dealer is not required to forgo a commission agreement with a financing agency in order to provide a prospective customer with the lowest possible rate. *Id.* at 789. Under the court's reasoning, the statement that 18.25 % was the lowest rate that Auburn Ford could get was not a false statement. The plaintiff seeks to distinguish the *Ex Parte Ford Motor Credit* case on the ground that the plaintiff in this case was an unsophisticated buyer. According to *Ex Parte Ford Motor Credit,* the sophistication of the buyer relates to the reliance issue, not the issue of whether there was a material false statement. *Id.* Auburn Ford is entitled to summary judgment on this claim.

## 2. SUPPRESSION (Count II)

■ The plaintiff's claim of suppression relates to the difference between the contract signed by Pescia and the contract assigned to FMCC. The material differences concern the down payment, the amount financed, and the interest rate. According to the plaintiff, the root of the fraud is the practice of "spot financing" or "spot delivery." Spot delivery or spot financing is a practice utilized by automobile dealers to allow customers to take delivery of their vehicle pending financing by a lending institution. *See Dodge City, Inc. v. Byrne,* 693 So.2d 1033, 1034 (Fla. 2d Dist.Ct.App.1997). In all reported cases which the court has been able to find concerning the issue of spot financing or spot delivery, there is some disclosure to the customer that the sale is not final and that the sale is subject to the approval of the financing institution. In *Dodge City, Inc., supra,* for example, the contract at issue stated:

> In consideration of the delivery to the purchaser(s) from the seller of the motor vehicle described in the attached retail installment sales contract, Receipt of which is hereby acknowledged the purchaser(s) acknowledges that the sale and delivery is subject to the acceptance and approval of the said contract by the financing institution specified within three (3) days from the date thereof.

*Id.* Likewise, the contract at issue in *Castellana v. Conyers Toyota, Inc.,* 200 Ga. App. 161, 407 S.E.2d 64 (1991), had language indicating its contingent nature. The "spot delivery form" provided to the purchaser by Conyers Toyota "clearly states that the credit application had not been approved or rejected by Toyota Motor Credit Corporation and that the buyer could take possession and use the vehicle pending approval of the application for credit." *Id.* at 67. The opinion goes on to list the several other places where the purchaser was informed of the contingent nature of the agreement. In the *Conyers Toyota* case, the plaintiff argued that she had been defrauded because "she would not have signed the documents in question had she not been told by CTI's salesman that her credit had already been approved." The Georgia court held that there had been no fraud because the documents the plaintiff signed negated the alleged fraud.

■ In this case, under the view of the evidence most favorable to the plaintiff,

there was absolutely no disclosure to the plaintiff that the contract she signed was not final, or that it could be changed at a later date. The appropriate question, therefore, is whether Auburn Ford had a duty to disclose the fact that the sale was not final and that the financing arrangements could change. As the Alabama Supreme Court has recently made clear, the existence of a duty to disclose is a question of law to be determined by the trial judge not a question of fact for the jury. *State Farm Fire & Cas. Co. v. Owen*, 729 So.2d 834 (Ala.1998), *opinion modified on denial of rehearing* (1999).

> ... [t]he question of duty is a judgment whether the law will impose responsibility on a party for its conduct toward another. The concept of duty amounts to no more that the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection from the harm suffered.

*Id.* at 839 (*quoting* Stuart M. Speiser *et al., The American Law of Torts* § 9.3 at 1008). According to the *State Farm* opinion, in resolving the question of whether Auburn Ford had a duty to disclose, a court should consider a number of factors: (1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of a particular fact; (4) the customs of the trade; and (5) other relevant circumstances. *Id.* at 842–43.

In this case, the parties are an automobile dealer and a customer. Since a dealer engages in sales financing negotiations on a regular basis in the course of its business, there is an inherent disparity of knowledge between the customer and the dealer. This is particularly true in the pending action because all of the communications concerning financing with the potential lenders was conducted by the business manager of the dealership outside the presence of Ms. Pescia. The dealer had all the knowledge about the contingent

nature of financing and the contingent nature of the contract because the contract and related documents did not include any information indicating that the contract terms were not final. Moreover, based on the facts of cases discussing the issue, it appears that the custom in the industry is to disclose the contingent nature of "spot financing" or "spot delivery" contracts. The court has little trouble concluding, under *State Farm*, that Auburn Ford was required to inform the plaintiff that the sale of the car to her was not final, was subject to approval by FMCC, and that the terms and conditions of the final contract might be different from the contract which she signed. There is sufficient evidence before the court which demonstrates that no such disclosures were made in this case.

 Having decided that a duty to disclose exists, the court must now decide whether the plaintiff has presented sufficient evidence on the other elements of a fraudulent suppression claims. In addition to a duty to disclose, the other elements of a claim for fraudulent suppression are concealment or non-disclosure of material facts, inducement of the plaintiff to act and action by the plaintiff to his injury. *Ex Parte Ford Motor Company*, 717 So.2d at 785–86. As noted above, the court finds that there is sufficient evidence to show that the defendants did not tell Ms. Pescia that the contract she signed was not final and that the financing conditions could change. Those are material facts relating to the automobile purchase. According to Ms. Pescia, she took delivery of the car based on the contract signed on August 14, 1996. The court is satisfied that Pescia has produced sufficient evidence from which it could be found or inferred that she would not have accepted the deal offered her at the time of sale if she had known that the defendants would credit her with $700.00 less of a down payment than she made.[5]

---

5. The court understands that there is a factual dispute over the amount of the deposit. In deciding whether summary judgment should be granted, however, the court must view the evidence in a light most favorable to the plaintiff and where there are disputed facts, the court must accept the plaintiff's version.

The most troublesome element of plaintiff's fraudulent suppression claim is the element of damages. According to the Pescia's evidence, she committed herself to purchasing a Ford Taurus from Auburn Ford by signing a contract which showed that she made a down payment of $1719.83. That contract obligated her to pay a loan which totaled $16,000 at 18.25% interest for 60 months making the monthly payments $411.58. When Pescia left Auburn Ford on August 14, those were the terms of her contract. She was not told that the terms could be changed, and had no reason to believe that they would. The terms were changed and she ended up financing $16,700 for 60 months at a rate of 16.25 % making the monthly payments $411.09. Thus, the plaintiff saves $0.49 per month. Plaintiff complains, however, that she has lost $700 of her down payment.[6] Thus, while plaintiff has saved $29.40 in payments over the 60 month period, she lost the use of her $700 for the same amount of time. She has suffered some economic injury although that injury is not significant.[7]

Pescia also claims damages for mental anguish caused by the fraud which relates to the loss of $700.00 of her down payment and the forging of her name on a contract. The court cannot say, as a matter of law, that the plaintiff would not recover mental anguish damages.

Based on the foregoing analysis, the court concludes that the Ms. Pescia has presented sufficient evidence on her claim of fraudulent suppression to avoid summary judgment.

### 3. THE TORT OF OUTRAGE (Count III)

Ms. Pescia also contends that the Auburn Ford engaged in conduct so severe as to make it liable for intentional infliction of emotional distress. Under Alabama law, the elements of a claim for intentional infliction of emotional distress or outrage are: (1) the actor intended to inflict emotional distress where the actor knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; and (3) the resulting distress was severe. *American Road Service Co. v. Inmon*, 394 So.2d 361, 364 (Ala.1980). Only conduct that is "so outrageous in character, and so extreme in degree so as to go beyond all possible bounds of decency" and "is atrocious and utterly intolerable in a civilized society" is severe enough to support an outrage claim. *Boykin v. Magnolia Bay, Inc.*, 570 So.2d 639, 642–43 (Ala.1990). The tort of outrage is reserved for actions such as wrongful conduct in the context of family burials, cases where insurance agents have employed barbaric means to coerce settlements and cases of egregious sexual harassment. *See Ex Parte Crawford & Co.*, 693 So.2d 458 (Ala. 1997).

The conduct of Auburn Ford in this case, while actionable, hardly rises to the level required to be actionable as an outrage claim. Auburn Ford is entitled to summary judgment on this claim.

### 4. NEGLIGENCE (Count V)

Ms. Pescia claims that Auburn Ford was negligent in its treatment of her. Under well-settled Alabama law, the elements of negligence are (1) duty, (2) breach of duty, (3) proximate cause, and (4) injury. *Albert v. Hsu*, 602 So.2d 895, 897 (Ala.1992). A claim for negligence can arise from a failure to disclose information where there was a duty to disclose such information. *See Army Aviation Center Federal Credit Union v. Johnson*, 716 So.2d 1250 (Ala.Civ.App.1998). In this case, the court has concluded that Auburn

---

6. The court rejects the plaintiff's argument that she is somehow entitled to the difference in payments between the amount originally financed and that amount financed at 16.25%. As previously noted, Auburn Ford was not required to disclose the fact that they received a yield spread premium.

7. Under the contract which plaintiff negotiated with Auburn Ford, the total payments would have been $24,694.80. Under the contract assigned to FMCC, she would pay a total of $24,665.40.

Ford had a duty to disclose to the plaintiff that the contract which she had signed was contingent on obtaining financing and could be changed without her knowledge. Ms. Pescia has provided sufficient facts to establish a breach of the duty to disclose and, therefore, survives summary judgment on the negligence claim.

### 5. NEGLIGENT SUPERVISION (Count IX)

Ms. Pescia also claims that Auburn Ford negligently failed to supervise its employees by allowing them to engage in "spot financing" or "spot delivery." The elements of a claim of negligent supervision are set out in the decision of the Alabama Supreme Court in *Lane v. Central Bank of Alabama N.A.*, 425 So.2d 1098 (Ala.1983). There the court noted:

> In the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him. Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge. It is incumbent on the party charging negligence to show it by proper evidence.

*Id.* at 1100. It is thus clear that an essential element of the tort of negligent supervision is notice, to the employer, of the employee's offending conduct.

The plaintiff, in this case, complains about the use of "spot delivery" or "spot financing." There is no case law which suggests that there is anything unlawful about this practice if there is adequate notice to the consumer. In this case, the plaintiff has presented evidence which, if taken as true, establishes that she was not told that her car was "spot financed" or "spot delivered" and that she was not told about the consequences of that practice. The plaintiff has presented no evidence, however, from which it could be found or inferred, that this lack of notice was a widespread practice at Auburn Ford. To the contrary, Auburn Ford has presented uncontradicted evidence that the practice of the dealership was to provide notice to the consumer that the financing on a particular car was not complete. The plaintiff has not presented any evidence from any other consumers from which a finding could be made that there were other incidents like Ms. Pescia's where the consumer was not informed about the contingent nature of the contract. Accordingly, the plaintiff has failed to provide sufficient evidence to avoid summary judgment on her negligent supervision claim.

### 6. CIVIL CONSPIRACY (Count X) (Conspiracy between FMCC, Auburn Ford and A.J. Ferguson)

The plaintiff claims that FMCC, Auburn Ford and A.J. Ferguson entered into a civil conspiracy to prevent her from recovering any judgment against Auburn Ford or Andrew Ferguson. The basis for the plaintiff's claim is the financial maneuvering which took place when FMCC discovered that Auburn Ford was "out of trust" for $1,800,000. That discovery by FMCC took place some time around August 19, 1996. On that date, FMCC assigned one of its employees full time to oversee Auburn Ford's operations to insure that there was no further deterioration of the FMCC's assets. The evidence shows that on August 26, 1996, Andrew Ferguson and his wife executed a mortgage to FMCC for $784,000. On December 16, 1996, additional mortgages were extended to FMCC. The new mortgage signed by Ferguson on December 16, 1996 certified that there were no lawsuits pending against Auburn Ford when, in fact, the plaintiff's lawsuit had been filed and served on Auburn Ford on November 21, 1996. On July 30, 1997, A.J. Ferguson entered into an asset purchase agreement with Carl Gregory to sell all of the assets of Auburn Ford. The asset purchase agreement contained a representation by Ferguson that "there are no actions, suits or proceedings which have been served on

seller." At the time of the agreement, Auburn Ford had been sued but Ferguson had not. Ferguson was not added as a defendant in this action until February 1998. According to the undisputed evidence presented by the defendants, neither Mr. Ferguson nor FMCC benefitted from the sale. Ferguson received no money and FMCC lost an undetermined amount of money.

Under Alabama law, a civil conspiracy requires a combination of two or more individuals to accomplish a lawful end by unlawful means. A civil conspiracy action focuses not on the conspiracy alleged, but on the wrong committed by virtue of the alleged conspiracy. The viability of a civil conspiracy claim depends upon the viability of the claim relating to the underlying civil wrong made the subject of the conspiracy. The conspiracy itself furnishes no cause of action. *Williams v. Norwest Financial Alabama, Inc.*, 723 So.2d 97, 104 (Ala.Civ.App.1998). As with all of the claims in this case, once faced with a motion for summary judgment, the plaintiff's burden is to present some evidence in support of the essential elements of her claim. In this case, the evidence she has presented is insufficient to establish a civil conspiracy to prevent her from collecting any judgment she may obtain. There is no evidence that the plaintiff's lawsuit was ever discussed by anyone during the financial transactions relating to the mortgages or the sale of the businesses. The only evidence relating to any lawsuits relates to the fact that Ferguson certified·that there were no lawsuits pending at the time of his mortgage and sale. Indeed, at the time of both events, Auburn Ford had been sued but Ferguson had not. These certifications do not create an inference that the mortgages and the sale were for the purpose of depriving the plaintiff of assets from which she could recover a judgment. This civil conspiracy claim fails.

8. The claims discussed in this section are the claims discussed in the plaintiff's brief in opposition to FMCC's motion for summary judg-

## 7. CIVIL CONSPIRACY (Count XI) (Conspiracy between Auburn Ford and FMCC)

In count XI of her complaint, Ms. Pescia alleges that Auburn Ford and FMCC conspired to suppress material information because FMCC "led the plaintiff to believe that it would respond to plaintiff's inquiry and advise her what was going on and to clear up the discrepancies within her account with FMCC." There is absolutely no evidence presented by Ms. Pescia from which it could be found or inferred that there was a conspiracy between FMCC and Auburn Ford to keep her from learning the truth about her contract. Indeed, it was FMCC who called Ms. Pescia and that phone call provided her with the information which generated this lawsuit. In addition, the undisputed evidence is that FMCC contacted Auburn Ford, through Mr. Floyd, about the discrepancy in Pescia's contracts and was informed that the down payment was not as Ms. Pescia had said. This information was not communicated to Ms. Pescia. However, it is a quantum leap from saying that FMCC should have communicated this information to Ms. Pescia to saying that there is a conspiracy to withhold information particularly where, as here, one of the alleged co-conspirators provided the plaintiff with the information which forms the basis for her lawsuit. Auburn Ford and FMCC are entitled to summary judgment on this claim.

## C. FMCC[8]

### 1. STATUTORY FRAUD (Count I)

The court has concluded that Auburn Ford is entitled to summary judgment on this claim. The claim is made jointly against Auburn Ford and FMCC. As the court noted above, there is no requirement that the yield spread premium be revealed.

ment. The statement of the claims varies slightly from the statement in the amended complaint.

Consequently, FMCC also is entitled to summary judgment on this claim.

## 2. SUPPRESSION (Count II)

The court has concluded that Ms. Pescia's suppression claim against Auburn Ford survives summary judgment. She also argues that FMCC is liable. It is undisputed that FMCC had no contact with the plaintiff at the dealership. The plaintiff has three potential theories of liability available—(1) contract, (2) agency, and (3) ratification.

### a. The Contract Theory

█ Ms. Pescia argues that FMCC is contractually liable for Auburn Ford's suppression of material facts because the retail installment contract contains a notice which reads

> NOTICE—ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF THE GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS THEREOF.

This provision of the contract is the commonly referenced holder provision which has the practical effect of eliminating the UCC's holder in due course rule. *Armstrong v. Edelson,* 718 F.Supp. 1372, 1378 (N.D.Ill.1989). However, as the governing regulations make clear, the words "claims and defenses" in the holder provision " ... are not given any special definition by the [FTC]." The phrase simply "incorporates those things which, as a matter of the applicable law, constitute legally sufficient claims and defenses in a sales transaction. Appropriate statutes, decisions, and rules in each jurisdiction will control ... " *LaBarre v. Credit Acceptance Corp.,* 175 F.3d 640 (8th Cir.1999) (*quoting* 40 Fed.Reg. 20,023–24 (1976)). Thus, the holder provision creates no new substantive causes of action under state law. It creates a federal right but that federal right has not been invoked in this case. *Eachen v. Scott Housing Sys. Inc.,* 630 F.Supp. 162 (M.D.Ala.1986). Thus, the in-clusion of this language in the contract simply, as noted above, undoes the UCC holder in due course rule. It does not mean that FMCC is liable to the plaintiff for Auburn Ford's alleged fraud. The state law of agency and ratification still determine that issue.

### b. Agency

█ Ms. Pescia also contends that FMCC is liable for Auburn Ford's fraud under the law of agency. Under Alabama law:

> The test for determining whether one is an agent of the defendant is whether the defendant has reserved the right of control over the means by which the work is done. Stated differently, the defendant must have reserved the right to direct not only what shall be done, but also how it shall be done.

*Wilson v. Direct Cable Tech., Inc.,* 964 F.Supp. 1548 (M.D.Ala.1997) (*Citations omitted*).

In this case, the evidence, viewed in a light most favorable to the plaintiff, establishes that Auburn Ford used forms provided by FMCC, received instructions about how to fill out the forms from FMCC, had direct access to FMCC's computer, and received instructions from FMCC that Ms. Pescia was to be given a "hard close." A "hard close" means that the dealership should explain to the customer the customer's responsibility. The evidence, however, also establishes that FMCC had absolutely no contact with Ms. Pescia until after the transaction was completed and that FMCC was not the only financing source contact by Auburn Ford.

In deciding the agency issue, it is important to focus on the wrong alleged by Ms. Pescia which survives summary judgment. The wrong relates to the practice of "spot financing" and "spot delivery" and the disclosures which are required to be made with such financing option. In this case, there is no evidence from which it could be found or inferred that FMCC controls how Auburn Ford decides to sell its automo-

biles. FMCC does not assert nor attempt to assert control over that aspect of the business. Nor does FMCC control or attempt to control the offer and acceptance process between the dealer and the consumer. FMCC does, indeed, tell the dealer the terms of assignment that it will accept but this is not sufficient control to establish agency. Nor is the "hard close" instruction. In this case, FMCC instructed Auburn Ford to do a hard close. That instruction is simply an instruction to the dealer that they inform the customer in detail about the contractual requirements so that there is no misunderstanding.[9] This instruction from FMCC does not establish the level of control necessary for a finding of agency. *See generally Wilson v. Direct Cable Technologies Inc.,* 964 F.Supp. at 1552, and authorities cited there; *Mardis v. Ford Motor Credit,* 642 So.2d 701, 705 (Ala. 1994) (FMCC exercised no influence over the dealer's negotiations with its customers and had no authority over how the dealer should conduct its business of selling cars to retail customers).

### c. Ratification

The plaintiff also contends that FMCC is liable because it ratified the fraud perpetrated by Auburn Ford. Pursuant to the Restatement (second) of Agency section 94 "[r]atification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act as to some or all persons is given effect as if originally authorized by him." Under Alabama law, in order for FMCC to be liable under a ratification theory for Auburn Ford's alleged fraud, Pescia must show that FMCC (1) had actual knowledge of Auburn Ford's allegedly fraudulent conduct; (2) knew or should have known that this conduct constituted a tort; and (3) armed with this knowledge it failed to take adequate steps to remedy the situation. *See Duckworth v. National Bank of Com-*

*merce,* 656 So.2d 340 (Ala.1994); *Watson v. Auto–Owners Ins. Co.,* 599 So.2d 1133 (Ala.1992).

Whatever knowledge FMCC had about Auburn Ford's alleged fraud comes from the conversation between Mike Bradshaw and Ms. Pescia when Bradshaw called to verify the terms of her contract. According to Bradshaw's deposition, Ms. Pescia simply informed him that there were differences between the contract that she had and the contract which he had. Ms. Pescia testified in a deposition that she told Bradshaw that there was a discrepancy in the down payment and the interest rate. The discrepancy in the interest rate was in her favor. She also testified that Bradshaw told her that he would take care of everything. According to her testimony, she sent Bradshaw a copy of the papers and then waited for him to act. The evidence presented by the defendants shows that FMCC inquired about the discrepancies at of Auburn Ford and was told that the down payment was not as the plaintiff stated.

The plaintiff's evidence establishes that an employee of FMCC was informed that there was a discrepancy between a contract which she had signed and the contract which had been assigned to FMCC. That employee was told that the plaintiff had made a down payment which was $700.00 greater than the amount which had been credited to her on the assigned contract. That employee also knew that the interest rate on the assigned contract was lower than the interest rate on the contract which the plaintiff had signed at the dealership. There is also evidence that FMCC was having significant problems at Auburn Ford during this time period. Viewing this evidence and inferences arising from the evidence in the light most favorable to the plaintiff, the court is compelled to conclude that the plaintiff has presented sufficient evidence of ratification

9. Deposition of Pervis Hester, pp. 74–75, 161, 163–64, 166–67; Deposition of D. Ferguson, pp. 366–67.

to avoid summary judgment. The evidence presented by her, if believed, provides actual knowledge that there were two contracts allegedly signed by the plaintiff that were different, that Auburn Ford had forwarded FMCC a contract which was different from the contract the plaintiff signed and that $700.00 of the plaintiff's down payment was missing. The FMCC employee knew or should have known that the actions of FMCC in forwarding a contract for assignment which was different from the contract which the plaintiff signed and which credited her with $700.00 less of a down payment constituted actionable fraud. The plaintiff has also presented evidence that the employee failed to take adequate steps to remedy the situation. Thus, the plaintiff has presented sufficient evidence of ratification to avoid FMCC's motion for summary judgment. Accordingly, it falls to a jury to decide whether FMCC ratified Auburn Ford's fraud.

### 3. THE TORT OF OUTRAGE (Count III)

For the reasons contained in the discussion of this claim in section III(B)(3), FMCC is entitled to summary judgment on this claim.

### 4. FRAUD (Count IV)

The plaintiff contends that she was the victim of fraud at the hands of FMCC because Mike Bradshaw told her he would take care of the discrepancies in her contract and get back to her. Bradshaw denies making any such statement. Even if he made the statement, his failure to follow up does not constitute fraud. Under well-settled Alabama law, in order to prevail on a claim of fraud based on a promise to perform an act in the future, a plaintiff must prove not only the traditional elements of misrepresentation but must additionally prove that the defendant intended, at the time of the alleged misrepresentation, not to do the act promised and that he intended to deceive the plaintiff. *Sides v. Drake*, 719 So.2d 853 (Ala.Civ. App.1998) (*citing P & S Business, Inc. v. South Central Bell Tel. Co.*, 466 So.2d 928,

930 (Ala.1985)). In this case, there is no evidence from which an intent not to do the act promised or an intent to deceive could be found. Indeed, the evidence is undisputed that some investigation was done by FMCC. FMCC is entitled to summary judgment on the claim.

### 5. SUPPRESSION (Count VI)

The plaintiff alleges that FMCC engaged in fraudulent suppression because it failed to disclose to the plaintiff what its investigation into the discrepancies in her contract revealed and because FMCC did not reveal to the plaintiff that it was going to require her to repay $16,700 when FMCC knew that the contract document she signed showed that she intended to finance only $16,000.

In order to recover on a claim of fraud by suppression, the plaintiff must establish (1) duty to disclose facts, (2) concealment or non-disclosure of material facts, (3) inducement of the plaintiff to act, and (4) action by the plaintiff to her injury. *Ex Parte Ford Motor Co.*, 717 So.2d at 785–86. Each of the fraud claims will be discussed individually.

#### a. Failure to Disclose the Results of the Investigation

The plaintiff claims that she is the victim of fraud by suppression at the hands of FMCC because FMCC did not tell her the results of its investigation into the discrepancies in her contract. According to the undisputed evidence, Jerry Floyd, an FMCC employee, discussed the discrepancies with Vandy Wilson some time after September 18, 1996. As noted above, Wilson showed Floyd a receipt for $1020.00 which explained the variation in the amount of the down payment. Wilson also explained the other problems with the contract. FMCC did not, however, communicate the results of the investigation to Ms. Pescia.

The first question that the court must resolve is whether FMCC had a duty to disclose. As previously noted, in decid-

ing whether or not a duty to disclose exists, the court should consider a number of factors including (1) the relationship of the parties, (2) the relative knowledge of the parties, (3) the value of a particular fact, (4) the customs of the trade, and (5) other relevant circumstances. *State Farm and Casualty Co. v. Owen,* 729 So.2d at 842–43.

For purposes of analysis, the court assumes without deciding that FMCC had a duty to disclose and that the disclosure related to material facts. The fraud claim still must fail because Ms. Pescia has failed to show that she was induced to act as a result of FMCC's representations or that she was injured. The only argument that Ms. Pescia makes concerning injury is that she would have taken further or additional steps to clear up the discrepancies or to investigate.[10] She presents no argument addressing how FMCC's failure to disclose its findings or its failure to investigate the matter personally injured her. Indeed, Ms. Pescia filed this lawsuit on November 13, 1996 less than three months after her purchase of the automobile so there was no delay in her pursuing legal action to resolve this matter. Further, there is no evidence that the information which FMCC uncovered would have helped her in anyway. According to FMCC's version of the facts, Wilson told Floyd that Ms. Pescia only provided a down payment of $1020.00 and that essentially, there was nothing wrong with the process. Wilson also showed Floyd a receipt which noted a $1020.00 down payment. None of this information was of assistance to Ms. Pescia. She has failed to provide any evidence of detrimental reliance and, therefore, she fails to demonstrate an essential element of her fraud claim against FMCC.

### b. Failure to Inform Plaintiff that She Would be Required to Repay $16,700

As the court has previously discussed, Ms. Pescia's evidence shows that she signed a contract in which the amount

financed was $16,000. The contract assigned to FMCC has an amount financed of $16,700, albeit at a lower rate, which makes her monthly payments less than they would have been under the contract which she signed. Ms. Pescia alleges that she was the victim of suppression because FMCC did not tell her that she would be required to pay $16,700 rather than $16,-000. The undisputed evidence before the court establishes that Ms. Pescia was aware that the contract on which she was making payments had an amount financed of $16,700. Ms. Pescia testified that Bradshaw told her that she should make the payments at $409.11 per month. She knew that those payments included an amount financed of $16,700 at 16.25%. There is simply no factual basis for this component of Ms. Pescia's fraud claim. FMCC is entitled to summary judgment on plaintiff's fraudulent suppression claims.

### 6. NEGLIGENCE (Count VII)

As noted previously, a plaintiff seeking to recover on a negligence claim must prove the following elements, a duty owed by defendant to plaintiff, a breach of that duty, and an injury proximately caused by that breach. *See Albert v. Hsu, supra; Salter v. United States,* 880 F.Supp. 1524, 1529 (M.D.Ala.1995). There is no case which suggests that FMCC owed an absolute duty to investigate Ms. Pescia's claims once Mike Bradshaw informed her that there was a difference between the contract she had signed and the contract which had been assigned to FMCC.[11] However, also under Alabama law, a person who voluntarily undertakes a duty may be held liable for failing to perform that duty. *Id.* at 1530. Ms. Pescia has stated both in her deposition and in an affidavit that Mike Bradshaw, after being informed of the discrepancies, told her that

---

**10.** Plaintiff's Brief in Opposition to FMCC's Motion for Summary Judgment, p. 45.

**11.** The question of absolute duty is distinct from the question of whether FMCC's actions constitute a ratification.

"he would take care of it." Her affidavit is more detailed. In it she states

> In August of 1996, Mike Bradshaw called me to verify that my contract with Ford Motor Credit had been satisfactory.
>
> He asked me what my contract showed and I told him. He told me that he would call me back when he checked into my situation further. My figures did not match his as I stated in my deposition.
>
> He specifically told me he would get in touch with me and let me know what was going on. He never told me he had another contract and other documents. No one with Ford Motor Credit or Auburn Ford ever contacted me again before I filed my lawsuit in November of 1996.
>
> I sent all my papers to Mr. Bradshaw as he told me to do to the address in Dothan, Alabama that he gave me. I never received this letter back even through (sic) it had my return address on it. I told him in the letter I sent that I looked forward to hearing from him about this as soon as he told me.

Bradshaw denies receiving any documents from Ms. Pescia. Viewing the evidence and the inferences arising from the evidence in a light most favorable to the plaintiff, as the court must, the court concludes that Ms. Pescia has provided sufficient evidence that FMCC undertook a duty to investigate the discrepancies in the contracts relating to her car purchase and to relate the results of the investigation to her. Contrary to the assertion in her brief, however, plaintiff has not presented any evidence that Bradshaw told her that he could correct the discrepancies. Neither Ms. Pescia's deposition nor her affidavit contains an statement from which it could be found or inferred that Bradshaw told her he would resolve the discrepancies. As Ms. Pescia notes in her affidavit,

"He told me he would get in touch with me and let me know what was going on."

The next question concerns whether there is evidence of breach of the duty assumed by FMCC to investigate and inform the plaintiff of its findings. The undisputed evidence shows that Jerry Floyd, an employee of FMCC, discussed the discrepancies with Van Wilson but that no one ever contacted Ms. Pescia to inform her about the results of that investigation. Also, there is no evidence which indicates that FMCC attempted to determine the validity of the plaintiff's signature on the contract which had been assigned to it. For purposes of summary judgment, this is sufficient evidence to raise a triable issue of fact whether FMCC breached a duty owed to the plaintiff.

The last issue of this claim concerns injury and proximate cause. The plaintiff's brief in opposition to summary judgment makes the following argument on causation and damages:

> Because Ford Motor Credit failed to properly investigate and correct the discrepancies and communicate with the plaintiff, she is paying interest on $700.00 that she did not borrow, she was not given full credit for the full down payment she made on the vehicle, and she has suffered emotional and mental distress by becoming mad, upset and embarrassed because of the treatment she received by Ford Motor Credit.
>
> The breach of duty to properly investigate or communicate with the plaintiff caused the damages mentioned above. If Ford Motor Credit would have properly investigated the discrepancies and corrected them as it undertook to do and as it represented to the plaintiff it would do, the plaintiff would not have been damaged because she would only be indebted for $16,000 and not $16,700.[12]

As previously noted, the duty which FMCC assumed was a duty to investigate

---

12. Plaintiff's Brief in Opposition to the Motion For Summary Judgment filed by FMCC, p. 49.

and to communicate. The evidence does not support a finding that FMCC agreed to work out the dispute to Ms. Pescia's satisfaction. Moreover, there is no evidence that Ms. Pescia suffered any injury proximately caused by the FMCC's negligent failure to investigate and inform her of its findings. The damages which Ms. Pescia argues·in this section are damages proximately caused by Auburn's alleged fraud, and FMCC's alleged ratification of that fraud and Auburn Ford's alleged negligence. There are no damages flowing from FMCC's alleged negligent investigation. Whatever damages flow from their lack of investigation relate to the ratification of Auburn Ford's fraud not to any negligence claim. FMCC is entitled to summary judgment on the negligence claim.

### 7. NEGLIGENT SUPERVISION (Count VIII) AND CIVIL CONSPIRACY (Count X)

For the reasons, discussed in Sections III(B)(5), (6) & (7) and III(C)(2)(b), FMCC is entitled to summary judgment on these claims.

### D. A.J. FERGUSON

### 1. CIVIL CONSPIRACY (Count X) AND NEGLIGENT SUPERVISION (Count XII)

The plaintiff claims that Andrew Ferguson conspired with Auburn Ford and FMCC and that he negligently failed to supervise his employees. Those claims have been discussed and resolved against the plaintiff in Sections III(B)(5) & (6) and merit no further discussion here.

### IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED:

1. That the motion for summary judgment filed by Andrew Ferguson be GRANTED and that all claims against Andrew Ferguson be DISMISSED with prejudice;

2. That the motion for summary judgment filed by Auburn Ford be DENIED as it relates to Count II (Suppression) and Count V (Negligence), and GRANTED as to all other claims. All claims against Auburn Ford except the claims stated in Count II and Count V are hereby DISMISSED with prejudice; and

3. That the motion for summary judgment filed by FMCC be DENIED as it relates to Count II (Suppression) and GRANTED as to all other claims. All claims against FMCC except the claim stated in Count II are hereby DISMISSED with prejudice.